## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Southern Division

JUSTIN D. TROUARD,

    12219 Livingston Road
    Fort Washington, MD 20744

JESSICA CHELTON,

    956 6th Street
    Penrose, CO 81240

                *Plaintiffs*,

    v.

DICKEY'S BARBECUE RESTAURANTS, INC.
a Texas corporation,

    Serve: Roland Dickey, Jr., Registered Agent
           801 E. Plano Parkway
           Suite 135
           Plano, TX 75074

ROLAND DICKEY, JR.

    Serve: Roland Dickey, Jr.
           4514 Cole Avenue
           Suite 1100
           Dallas , TX 75205

JERREL DENTON

    Serve: Jerrel Denton
           4514 Cole Avenue
           Suite 1100
           Dallas , TX 75205

                *Defendants*

Case No. 14-cv-1703

**COMPLAINT**
**For Violation of the Maryland Franchise Registration and Disclosure Law;**
<u>**Declaratory Judgment and Injunctive Relief**</u>

Plaintiffs Justin Trouard and Jessica Chelton, by counsel, state for their Complaint against Dickey's Barbecue Restaurants, Inc., Roland Dickey, Jr., and Jerrel Denton, as follows:

<u>**PARTIES AND JURISDICTION**</u>

1.      Plaintiff Justin Trouard ("Trouard") is an individual and citizens of the State of Maryland.

2.      Plaintiff Jessica Chelton ("Chelton") is an individual and citizen of the State of Colorado.

3.      Defendant Dickey's Barbecue Restaurants, Inc. ("Dickey's") is a Texas corporation that has its principal place of business in Plano, Texas.

4.      Defendant Roland R. Dickey, Jr. ("Roland") is a citizen of the State of Texas.  At all times relevant to the transactions and occurrences described herein, Roland was president and CEO of Dickey's.

5.      On information and belief, Defendant Jerrel L. Denton ("Denton") is a citizen of the State of Texas.  At all times to the transactions and occurrences described herein, Denton was Director of Business Development for Dickey's.

6.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that there is complete diversity of citizenship between all of the Plaintiffs and all of the Defendants, and the amount in controversy exceeds $75,000.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in the judicial district.

## FACTS COMMON TO ALL COUNTS

8.      Dickey's has been in the business of selling franchised restaurants under the trademark "Dickey's Barbecue Pit" since approximately 1994.  Dickey's markets its restaurants as "quick service fast casual dining."  Dickey's sells its restaurants to individuals with little or no restaurant experience and induces them to purchase the franchise in part by promising a comprehensive training program, known as Barbecue University.[1]  Dickey's also boasts "one of the lowest initial investments in the quick serve industry.[2]"

9.      In summer 2012, Trouard began researching franchise opportunities in the quick service restaurant market, including Dickey's Barbecue Pit.  Dickey's primary appeal to Trouard was its low initial investment requirement and that no prior restaurant experience was needed.  After speaking with Dickey's representatives and being told what he could expect to earn from operation of a Dickey's franchise, and how quickly he would be able to open the restaurant, Trouard Dickey's appeal was even greater.

10.     On or about August 7, 2012, Trouard had a telephone conversation with Denton regarding Dickey's franchise opportunities, and Trouard's interest in opening a franchise in Alexandria, Virginia.  During the phone conversation, Denton made express financial performance representations regarding Trouard's potential earnings from the operation of the franchise.  Specifically, Denton represented that:

      a.      the typical Dickey's franchisee earns $80,000 – $100,000 per month in gross profit;

---

[1] http://www.dickeysfranchising.com/nutshell.php (last visited 5/27/2014)

[2] http://www.dickeysfranchising.com/financials.php (last visited 5/27/2014).

      b.      the typical Dickey's franchisee would earn a monthly net profit of between 17-20% of the gross; and

      c.      during the time Denton had been working for Dickey's, not a single restaurant had failed due to poor financial performance.

11.     During the same phone conversation, Denton made express representations regarding the low initial investment required to open a Dickey's franchise.  Specifically, Denton represented that:

      a.      the average cost to open a restaurant using a second generation restaurant space was $60,000 - $70,000;

      b.      some franchisees had successfully opened second generation restaurants for as little as $30,000;

      c.      a major feature of Dickey's system, which allowed them to keep their opening costs so low, was that they recommended franchisees obtain second hand restaurant spaces, and allowed and encouraged franchisees to use second hand equipment and furniture to outfit the restaurant;

      d.      Dickey's had a "team of ladies" that search the internet on behalf of franchisees and locate second hand restaurant equipment and furniture;

      e.      that Dickey's "team of ladies" could obtain chairs, which cost $60 new, for $5.

12.     During the same phone conversation, Denton made express representations regarding the advertising support that Dickey's provided its franchisees.  Specifically, Denton represented that "a portion of the monthly royalty fee went to 'ad fund' that was used exclusively for promotion in the franchisee's local area."  Denton made this representation without

disclosing the manner by which the funds are to be raised and spent, or that Trouard would be able to obtain an accounting of those expenditures.

13.     After the phone call, Denton sent Trouard by email a copy of Dickey's Virginia Franchise Disclosure Document for 2011 ("2011 VA FDD").  A copy of the 2011 VA FDD is attached as **Exhibit A**.

14.     Trouard, a resident of Maryland, was unaware that the 2011 VA FDD was not registered under the Act.

<u>The Virginia Franchise Disclosure Document</u>

15.     The 2011 VA FDD did not contain any financial performance representations or earnings claims from the operation of the franchise.

16.     The 2011 VA FDD did contain information regarding the estimated initial investment required to open a restaurant that was generally consistent with the figures Denton had represented to Trouard over the telephone.  Specifically, Item 7 provided four different estimates of the initial cost to open a restaurant based on the type of property being developed, which Dickey's identified as "Non-Traditional Conversion", "Restaurant Conversion", "Retail Space Conversion", and "Shell Building Finish-Out".  Exh. A at 13.

17.     The FDD stated that the information provided in Item 7 was based on Dickey's "experience [ ] acquired in the barbecue restaurant business since 1941."  *Id.*at 16 n.17.

18.     The 2011 VA FDD defined the four  property types as follows:

    a.     a "Non-Traditional Conversion" was defined as "a conversion of a prior food service facility located within a convenience store, food court or other 'non-traditional' setting and typically containing approximately 400 square feet";

    b.     a "Restaurant Conversion" was defined as "the conversion of a previously finished out, equipped restaurant facility containing approximately 1,800 square feet";

c.      a "Retail Space Conversion" was defined as "the conversion of previously finished out commercial retail space not equipped with restaurant facilities and containing approximately 1,800 square feet"; and

d.      a "Shell Building Finish-Out" was defined as "unfinished commercial space in a "shell" condition, typically located within a commercial retail center and containing approximately 1,800 square feet". *Id*. at 16 n. 19.

19.      The estimates were arranged in order from lowest initial investment to highest:

a.      "Non-Traditional Conversion" was the least expensive type of property with an estimated initial investment of $63,956 - $117,956;

b.      "Restaurant Conversion" was the next lowest with an estimated investment range of $108,838 - $162,838;

c.      "Retail Space Conversion" was the second most expensive option, with an estimated initial investment of $256,282 -$310,282; and

d.      "Shell Building Finish-Out" was the most expensive type of property, with an estimated initial investment of $342,976 - $396,976. *Id*. at 13.

20.      Although the total investment figures listed in Item 7 were higher than the numbers given to Trouard by Denton during their phone conversation, they were generally consistent with respect to the costs Denton and Trouard had discussed — namely, leasehold improvements and equipment.  According to Item 7, the combined cost of improvements and equipment for a "Restaurant Conversion" — the specific property type Trouard was interested in and which Denton had used in his examples — was $59,783.  *Id*. at 13.

**The Virginia Franchise Agreement**

21.      On or about August 13, 2012, Trouard applied to become a Dickey's franchisee.

22.     On or about August 20, 2012, Denton called Trouard to follow up on their prior

phone call and Trouard's application.  During that phone call, Denton made express

representations concerning the operation of the franchise.  Specifically, Denton represented to

Trouard that if he paid his franchise fee by August 22, 2012, then Trouard would be able to open

his restaurant by November 22, 2012.  Denton made this representation without providing the

factual basis upon which the November 22, 2012 date was determined or estimated, or disclosing

the average elapsed time between the signing of a franchise agreement and the opening of the

restaurant for Dickey's other franchisees.

23.     Between August 7 and 22, 2012, Trouard applied for and secured loans in the

amount of approximately $70,000, which was the amount Denton had assured Trouard would be

sufficient to open his restaurant.

24.     On or about August 22, 2012, relying on the express representations Denton made

on August 7 and 20 with respect to the potential earnings, initial investment, franchisor support,

and operation of the franchise, as well as the information contained in the 2011 VA FDD,

Trouard sent Dickey's a check for $10,000 for payment of the franchise fee.  Because Trouard

was veteran of the U.S. Armed Forces, he was eligible to pay a smaller franchise fee than what

Dickey's usually charged.

25.     On or about August 23, 2012, Trouard sent Dickey's an executed copy of the

franchise agreement, which was dated August 27, 2012 ("Virginia Franchise Agreement").  A

copy of the executed Virginia Franchise Agreement is attached as **Exhibit B**.

26.     On or about August 30, 2012, Trouard was contacted by Ashley Spinn from

Dickey's Communications Department.  During that conversation, Trouard asked what his

official opening date was.  Spinn responded that she could not provide that information because

it was impossible to know at that point.  Trouard then informed Spinn that he had gone forward

with Dickey's because Denton had assured him that if he paid his franchise fee by August 22, he

could have his restaurant open by November 22, 2012.  Spinn responded incredulously, saying

she did not know what Denton was talking about or how he would know that since Dickey's had

not even seen any real estate properties or submitted any letters of intent ("LOI").

27.     Trouard attempted to contact Denton several times in September 2012 regarding

the opening date timeline, but Denton did not return any of Trouard's phone calls.

28.     Despite Denton's representations that Dickey's encouraged its franchisees to

work with second generation restaurant properties, Lauren Parker, Dickey's Director of Real

Estate pushed Trouard into taking an unimproved retail space because the rent was lower.  When

Trouard asked why she was so insistent on the space, she said if and when Trouard failed it

would be easier to pass onto another franchisee because of the low rent.

29.     Between September and October 2012, Trouard looked at various properties in

and around Alexandria, Virginia.  Trouard and Dickey's had identified 4 potential properties, and

submitted 4 LOIs; however, every landlord refused the offers, telling Trouard that the $70,000 he

had borrowed was inadequate, and that he was severely undercapitalized.

30.     On or about October 8, 2012, Trouard called Rick Ellis in Dickey's Real Estate

Department and stated that the location options that Dickey's had provided in Alexandria were

unsuitable and that Trouard was going to begin looking for himself.

**<u>Location of the Franchise Restaurant in Maryland</u>**

31.     Trouard found a suitable location that was a second generation restaurant and was

located at 18056 Mateny Road, Germantown, Maryland ("Germantown Property").  The landlord

told Trouard that, owing to the nature of the restaurant business, landlords in the Washington,

DC metropolitan area required as a standard practice that a potential lessee have liquid capital in

an amount sufficient to cover 12 month's rent before granting a lease. This amount was vastly more than what Denton had told Trouard, or what the information in the 2011 VA FDD stated with regard to amount of the initial investment required for rent. Trouard began searching for additional financing.

32. On or about October 31, 2012, Denton contacted Trouard and told him that because he had chosen a location in Maryland the parties would need to execute a new franchise agreement for the State of Maryland to replace the Virginia Franchise Agreement. Specifically, it was understood and agreed that Dickey's and Trouard would voluntarily agree to rescind the Virginia Franchise Agreement, and that Dickey's would apply the $10,000 franchise fee Trouard paid in connection with that agreement as payment of the franchise fee for the new franchise agreement. No other conditions were placed on the parties' agreement to rescind the Virginia Franchise Agreement.

33. Denton also explained that, in order to comply with the Act, Dickey's needed to send Trouard a new disclosure document registered in the State of Maryland. On or about October 31, 2012, Denton sent Trouard by email a copy of the Maryland franchise disclosures document with an issuance date of September 1, 2011 ("2011 MD FDD"). A copy of the 2011 MD FDD is attached as **Exhibit C**.

34. On or about November 1, 2012, Dickey's sent Stephen Kendrick out to survey and approve the Germantown Property, which he did.

<u>**The Maryland Franchise Disclosure Document**</u>

35. The 2011 MD FDD did not contain any financial performance representations or earnings claims from the operation of the franchise.

36.     The 2011 MD FDD contained similar information regarding the estimated initial investment required to open a restaurant as the 2011 VA FDD; however, the amounts were negligibly less:

      a.      "Non-Traditional Conversion" was the least expensive type of property with an estimated initial investment of $63,556 - $117,556;

      b.      "Restaurant Conversion" was the next lowest with an estimated investment range of $108,438 - $162,438;

      c.      "Retail Space Conversion" was the second most expensive option, with an estimated initial investment of $255,882 - $309,882; and

      d.      "Shell Building Finish-Out" was the most expensive type of property, with an estimated initial investment of $342,576 - $396,576.  *Id*. at 13-16.

37.     However, unknown to Trouard, on September 1, 2012, less than one month after Denton gave the 2011 VA FDD to Trouard, and almost 2 months before Trouard received the 2011 MD FDD, Dickey's had issued an updated version of its Maryland FDD ("2012 MD FDD").  A copy of the 2012 MD FDD is attached as **Exhibit D**.  In fact, Dickey's submitted the 2012 MD FDD to the Securities Division of the Office of the Maryland Attorney General for approval on October 4, 2012, more than 3 weeks before Trouard was given the 2011 MD FDD.  Thus, Denton knew, or through the exercise of reasonable care should have known, that the 2011 VA FDD and the 2011 MD FDD that he sent to Trouard were outdated and incorrect.

38.     The 2012 MD FDD made significant and material changes to the information provided in the 2011 MD FDD with respect to the estimated initial investment for the "Restaurant Conversion" property type.  Specifically, the estimated initial investment that

property type increased from $108,438 - $162,438 to $127,560 - $208,560 (a maximum 28% increase).

39.     Dickey's did not give Trouard the 2012 MD FDD, nor was he otherwise advised by Dickey's of the material changes it made to the 2011 MD FDD, prior to his purchase of a Dickey's franchise.

## Revelation of Materially Understated Property Costs

40.     On November 19, 2012, Trouard executed a lease for the Germantown Property.

41.     The lease for the Germantown Property required Trouard to put up $16,000 up front, which was 3-5 times more than what had been disclosed in Item 7 of the 2011 VA FDD.

42.     The monthly rent on the property was $7,900, which was significantly higher than what was estimated in either FDD Trouard had been given.  Moreover, in order to qualify for the lease, Trouard had to obtain a loan for $250,000, the amount equal to 12 months rent.  This alone was more than three times what Denton had said would be the complete cost to open the restaurant.

## Revelation of Materially Understated Equipment Costs

43.     During November 2012, after the lease was executed, Trouard was contacted by his Dickey's Project Manager, Barry Callahan.

44.     Callahan told Trouard what equipment to purchase.  Although Trouard was told by Denton that the cost benefit of opening a second generation restaurant was that much of the equipment and infrastructure was already in place, Trouard soon discovered that was not true.

45.     Stephen Kendrick, who approved the Germantown Property on behalf of Dickey's, was also responsible for taking an inventory of the equipment on the property in order to determine whether it could be used or whether it would need to be replaced.  However,

Kendrick failed to do the inventory, and Trouard was required to purchase almost all new equipment.

46.     When Trouard inquired about using second hand equipment, Callahan told him that used equipment was not permitted.

47.     When all the required equipment had been purchased, the costs were over $60,000—much more than double what Denton represented to Trouard in August 2012, and almost double the $37,633 listed in Item 7 of the FDDs for a "Restaurant Conversion".

## Revelation of Materially Understated Construction Costs

48.     Shortly after signing the lease in November 2012, Trouard began converting his property to a Dickey's Barbecue Pit.  He was given draft plans by Dickey's that were made using measurements that had been taken by Stephen Kendrick.

49.     However, Trouard soon discovered that Kendrick had negligently measured the premises, causing the plans Trouard received from Dickey's to be inaccurate, including incorrectly locating existing walls.  As a result, the plans required Trouard to make several unnecessary modifications, which greatly increased his costs, and ultimately forced Trouard to hire his own architect to provide corrected drawings.

50.     To save money, Trouard performed all of the construction work himself with the help of his father.  Even with the savings of doing the work directly, the cost to convert his second generation restaurant into a Dickey's Barbecue Pit was over $66,000—much more than what Trouard had been told by Denton, and several multiples higher than the $19,150 amount listed for "leasehold improvements" in Item 7 of the FDDs for the "Restaurant Conversion".

## The Maryland Franchise Agreement

51.     Although Trouard was told in October and understood that the location of the restaurant in Maryland required the parties to rescind the current Virginia Franchise Agreement

and replace it with a different, Maryland-approved agreement, by late December 2012 that had still not been done.

52.     On December 21, 2011, the 2012 MD FDD was officially approved by the State of Maryland; however, Dickey's never provided Trouard with a copy of it, despite the fact that the parties had still not executed a franchise agreement for the Germantown Property by that time.

53.     In fact, Trouard did not execute the MD Franchise Agreement until or about February 19, 2013, just three days before his restaurant opened for business.  However, the agreement was back-dated to November 26, 2012 by Dickey's personnel.  A copy of the Maryland Franchise Agreement is attached as **Exhibit E**.[3]

54.     In addition, on February 19, 2013, the same day he was asked to execute the Maryland Franchise Agreement, Dickey's gave Trouard a letter that he was required to sign with the Maryland Franchise Agreement.  Although Dickey's wrote the letter, it was also back dated to November 27, 2012, drafted as if it were written by Trouard and addressed to Dickey's, and stated that Trouard had never received financial performance representations from anyone affiliated with Dickey's (the "Earnings Claim Letter").  A copy of the Earnings Claim Letter is attached as **Exhibit F**.

55.     The contents of the Earnings Claim Letter were false and known by Dickey's to be false.  Trouard has specifically advised Dickey's on more than one occasion that Denton had told him specific information about what he could expect to earn as a franchisee.

---

[3]     On April 30, 2013, the Maryland Franchise Agreement was amended to add Jessica Chelton as a party.  This amendment was mandated by Dickey's in order to qualify Chelton as an operating manager of the restaurant.  Although bound by the agreement, Chelton contributed none of her personal funds, and is party to this lawsuit only as a necessary party under Fed.R.Civ.P. 19(a)(1).

56.     Trouard was told that he would need to sign the Maryland Franchise Agreement and the Earnings Claim Letter in order to open his restaurant.  Because Trouard had already invested too much into the project at that point, he felt he had no choice but to sign the agreement and letter.

## Revelation of the Materially False Earnings Claims

57.     On February 22, 2013, Trouard officially opened the restaurant for business.  In total, Trouard expended more than $370,000 to open his Dickey's franchise, more than twice as much as the highest estimated initial investment for a "Restaurant Conversion" as stated in the 2011 MD FDD.

58.     In the first month of operations, using Dickey's monthly sales and revenue ("MSR") forms to perform the calculations, Trouard earned a net profit of approximately $10,000.  However, in reality, Trouard lost money.  This is because Dickey's MSR forms did not account for costs associated with the bar in Trouard's restaurant, such as alcohol and entertainment costs.  Also, the $10,000 was based on no rent, which was free for the first seven months, and also didn't account for sales and use taxes.

59.      Since opening in February 2013, Trouard's restaurant lost money every single month, causing Trouard and Chelton to incur significant debts.

60.     In January 2014, unable to pay the rent and overwhelmed with other debts and expenses incurred in connection with his purchase of the franchise, Trouard closed the restaurant.

## Events Precipitating The Lawsuit

61.     In December 2013, Trouard sought legal counsel.

62.     On December 26, 2013, Trouard, by counsel, advised Dickey's of Trouard's claims of multiple violations of the Maryland Franchise Registration and Disclosure Law, Md.

- 14 -

Code, Bus. Reg. § 14-201 *et seq.* ("MFRDL" or the "Act") in connection with the sale of the franchise.  Trouard demanded rescission of the agreement pursuant to the Act.

63.     Between January 3 and 16, 2014, counsel for the parties had several conversations by phone or email regarding Trouard's claims, specifically discussing mediation to resolve the dispute.

64.     On January 16, 2014, Dickey's filed a demand for arbitration with the American Arbitration Association, designated as Case Number 71 114 Y 00028 14, and styled as *Dickey's Barbecue Restaurants, Inc. AND Justin Trouard* ("Pending Arbitration").  The Pending Arbitration alleged numerous material violations of the Franchise Agreement by Trouard and Chelton, asserting claims for breach of contract and fraud.  The demand sought over $620,000 in damages.  A copy of the Demand for Arbitration is attached as **Exhibit G**.

65.     On January 17, 2014, Trouard's counsel sent a letter to Dickey's, advising that the arbitration agreement in the Maryland Franchise Agreement was unenforceable, and demanding the arbitration be withdrawn.  Dickey's refused.

66.     On February 5, 2014, Trouard's counsel sent a letter to the AAA advising that the agreement on which Dickey's demand was based, the Virginia Franchise Agreement, had been rescinded and was not enforceable.  Further, Trouard's counsel advised that the Maryland Franchise Agreement did not have an enforceable agreement to arbitrate, and that Trouard considered the arbitration without any validity.

67.     Trouard's counsel did not receive any further communication from AAA, and believed that the matter had been administratively closed on April 22, 2014.  However, on May 20, 2014, Trouard learned that Dickey's had paid the required fee to proceed when AAA contacted Trouard's counsel regarding selection of an arbitrator.  This action followed.

## COUNT I – DISCLOSURE VIOLATION
### Damages and Rescission of Franchise Agreement
### for Violation of Maryland Franchise Registration and Disclosure Law

68.     Trouard repeats and incorporates by reference the allegations in Paragraphs 1-67, above, as if fully set forth.

69.     In August 2012, Dickey's sold Trouard a Dickey's Barbecue Pit franchise by means of an offer that was not registered under the Act, in violation of Section 14-228.

70.     The sale was subject to the provisions of the Act pursuant to Section 14-203(a), because Trouard was a resident of the State of Maryland.

71.     Defendants Denton and Roland are jointly and severally liable with Dickey's pursuant to Sections 14-227(d)(iii) and (v) of the Act.

72.     As a direct and proximate result of Defendants' wrongful conduct, Trouard was induced to purchase a Dickey's Barbecue Pit franchise and suffered financial loss in excess of $1,000,000.

73.     Pursuant to Sections 14-227(a) and (b) of the Act Defendants are civilly liable to Trouard for the damages sustained as a result of the grant of the franchise.

## COUNT II – DISCLOSURE VIOLATION
### Damages and Rescission of Franchise Agreement
### for Violation of Maryland Franchise Registration and Disclosure Law

74.     Trouard repeats and incorporates by reference the allegations in Paragraphs 1-67, above, as if fully set forth.

75.     In February 2013, Dickey's sold Trouard a Dickey's Barbecue Pit franchise by means of an offer that was not registered under the Act, in violation of Section 14-228. Specifically, Dickey's failed to provide Trouard with a copy of the 2012 MD FDD, the then current offering registered with the State of Maryland at the time.

76.     The sale was subject to the provisions of the Act pursuant to Section 14-203(a), because Trouard was a resident of the State of Maryland.

77.     Defendants Denton and Roland are jointly and severally liable with Dickey's pursuant to Sections 14-227(d)(iii) and (v) of the Act.

78.     As a direct and proximate result of Defendants' wrongful conduct, Trouard was induced to purchase a Dickey's Barbecue Pit franchise and suffered financial loss in excess of $1,000,000.

79.     Pursuant to Sections 14-227(a) and (b) of the Act Defendants are civilly liable to Trouard for the damages sustained as a result of the grant of the franchise.

80.     Pursuant to Section 14-227(c) of the Act the Court may order Dickey's to rescind the franchise and make restitution to Trouard.

### COUNT III – EARNINGS CLAIM
### Damages and Rescission of Franchise Agreement
### for Violation of Maryland Franchise Registration and Disclosure Law

81.     Trouard repeats and incorporates by reference the allegations in Paragraphs 1-67, above, as if fully set forth.

82.     In connection with the sale of a Dickey's Barbecue Pit franchise to Trouard in August 2012 and February 2013, Dickey's, by and through its authorized agent Jerrel Denton, made numerous representations of, or from which could be ascertained, specific levels or ranges of actual or potential sales, income, or profit from Dickey's franchised units, which earnings claims were not included in any FDD provided to Trouard.  This conduct was in violation of MD. CODE REGS. (COMAR) 02.02.08.16(D)(3) and, by operation of law, Section 14-229(a)(3) of the Act.

83.     Defendants Denton and Roland are jointly and severally liable with Dickey's pursuant to Sections 14-227(d)(iii) and (v) of the Act.

84.     As a direct and proximate result of Defendants' wrongful conduct, Trouard was induced to purchase a Dickey's Barbecue Pit franchise and suffered financial loss in excess of $1,000,000.

85.     Pursuant to Sections 14-227(a) and (b) of the Act Defendants are civilly liable to Trouard for the damages sustained as a result of the grant of the franchise.

86.     Pursuant to Section 14-227(c) of the Act the Court may order Dickey's to rescind the franchise and make restitution to Trouard.

## COUNT IV – OTHER PROHIBITED ACTS
### Damages and Rescission of Franchise Agreement
### for Violation of Maryland Franchise Registration and Disclosure Law

87.     Trouard repeats and incorporates by reference the allegations in Paragraphs 1-67, above, as if fully set forth.

88.     In connection with the sale of a Dickey's Barbecue Pit franchise to Trouard in August 2012 and February 2013, Dickey's, by and through its authorized agent Jerrel Denton, made oral statements concerning:

a.     advertising support that would be provided by Dickey's, without disclosing the manner by which the funds were to be raised and spent, or that Trouard could obtain an accounting of expenditures, in violation of COMAR 02.02.08.16.G(1); and

b.     the date by which Trouard's prospective franchise would be totally operational, but failed to disclose the factual basis upon which that date has been determined or estimated, or the average elapsed time between the signing of a franchise contract and the beginning of conduct of business of Dickey's other franchisees throughout the continental United States and Canada, in violation of COMAR 02.02.08.16.E(1).

89.     This conduct was in violation of Section 14-229(a)(3) of the Act.

90.     Defendants Denton and Roland are jointly and severally liable with Dickey's

pursuant to Sections 14-227(d)(iii) and (v) of the Act.

91.     As a direct and proximate result of Defendants' wrongful conduct, Trouard was

induced to purchase a Dickey's Barbecue Pit franchise and suffered financial loss in excess of

$1,000,000.

92.     Pursuant to Sections 14-227(a) and (b) of the Act Defendants are civilly liable to

Trouard for the damages sustained as a result of the grant of the development right.

93.     Pursuant to Section 14-227(c) of the Act the Court may order Dickey's to rescind

the agreement and make restitution to Trouard.

**COUNT V – FRAUD**
**Damages and Rescission of Franchise Agreement**
**for Violation of Maryland Franchise Registration and Disclosure Law**

94.     Trouard repeats and incorporates by reference the allegations in Paragraphs 1-67,

above, as if fully set forth.

95.     In connection with the sale of a Dickey's Barbecue Pit franchise to Plaintiffs in

August 2012 and February 2013, Dickey's, as well as the individual Defendants, and each of

them, made multiple untrue statements of material fact, and omitted to state material facts

necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading.

96.     The untrue statements of material fact and omissions of material fact were made

by Defendants during the period of August 7-20, 2012, by and through the express

representations of Jerrel Denton, the 2011 VA FDD, and on October 31, 2012, through the

superseded and inaccurate 2011 MD FDD.

97.     Specifically, the statements made by Denton on august 7 and the information contained in Item 7 of the FDDs materially misrepresented the initial investment amount required to open a Dickey's franchise.  Denton represented to Trouard that a second generation restaurant could be converted to a Dickey's restaurant for $70,000 or less, and that many franchisees had converted second generation restaurants for as little as $30,000.  The FDDs stated that the total initial investment required to open a Dickey's restaurant from a second generation restaurant was between approximately $109,000 and $163,000.  Trouard's actual initial investment was more than $370,000.

98.     In addition, the statements made by Denton on August 7, 2012, and the information contained in Item 8 of the FDDs, materially misrepresented, or materially failed to state, Dickey's policy regarding used equipment.  Denton told Trouard that Dickey's encouraged its franchisees to obtain used equipment and had a dedicated "team of ladies" whose sole purpose was to help its franchisees source second-hand equipment.  Item 8 of the FDDs provided no information that contradicted or was inconsistent with Denton's statements.  However, when Trouard requested to use second hand equipment, Dickey's prohibited it.

99.     On September 1, 2012, two months before Trouard received the 2011 MD FDD, Dickey's issued an updated FDD, which reflected an estimated initial investment for a "Restaurant Conversion" that was 28 percent higher than what contained in the 2011 MD FDD. The 2012 FDD was submitted to the Securities Division of the Maryland Office of the Attorney General for renewed registration under the Act on October 4, 2012, more than 3 weeks before Dickey's disclosed Trouard with the 2011 MD FDD.

100.    The material inaccuracy Denton's statements and the information provided in the 2011 VA and MD FDDs with regard to the estimated initial investment and Dickey's policy

regarding used equipment were known to Defendants or should have been known through the exercise of reasonable care prior to October 31, 2012.

101.    Trouard did not know, and in the exercise of reasonable care could not have known, of the untruths and omissions.

102.    Dickey's conduct was in violation of Section 14-229(a)(3) of the Act.

103.    Defendants Denton and Roland are jointly and severally liable with Dickey's pursuant to Sections 14-227(d)(iii) and (v) of the Act.

104.    As a direct and proximate result of Defendants' wrongful conduct, Trouard was induced to purchase a Dickey's Barbecue Pit franchise and suffered financial loss in excess of $1,000,000.

105.    Pursuant to Sections 14-227(a) and (b) of the Act Defendants are civilly liable to Trouard for the damages sustained as a result of the grant of the franchise.

106.    Pursuant to Section 14-227(c) of the Act the Court may order Dickey's to rescind the agreement and make restitution to Trouard.

### COUNT VI – FRAUD
### Damages and Rescission of Franchise Agreement
### for Violation of Maryland Franchise Registration and Disclosure Law

107.    Trouard repeats and incorporates by reference the allegations in Paragraphs 1-67, above, as if fully set forth.

108.    In connection with the sale of a Dickey's Barbecue Pit franchise to Plaintiffs in February 2013, Dickey's, as well as the individual Defendants, and each of them, engaged in an act, practice, or course of business that operated as a fraud or deceit on another person.

109.    Specifically, Dickey's told Trouard in October 2012 that it would agree to rescind the Virginia Franchise Agreement and enter into a Maryland Franchise Agreement in connection with Trouard's selection, and Dickey's approval, of a location in Germantown, Maryland.

Without this agreement, Trouard's opening of a restaurant in Germantown, and his failure to open a restaurant in Alexandria, Virginia, would have put Trouard in default under the Virginia Franchise Agreement.

110.    Dickey's did not immediately rescind the Virginia Franchise Agreement, but permitted and encouraged Trouard to proceed with opening the restaurant in Germantown, including entering a lease for the property as well as incurring other long-term obligations in connection therewith.

111.    After Trouard had incurred those significant financial obligations, Dickey's conditioned the rescission of the Virginia Franchise Agreement and execution of the Maryland Franchise Agreement on Trouard's attestation that he had received no financial performance representations on behalf of Dickey's.

112.    On February 19, 2013, only 3 days before Trouard's restaurant was scheduled to open, Dickey's presented Trouard with the Earnings Claim Letter, which conditioned Dickey's agreement to rescind the Virginia Franchise Agreement and enter into the Maryland Franchise Agreement on Trouard's affirmation that he received had received no financial performance representations from or on behalf of Dickey's, which representations Dickey's knew, or in the exercise of reasonable care should have known, to be false.

113.    In addition, by conditioning the rescission of the Virginia Franchise Agreement on Trouard's execution of the Earnings Claim Letter, Dickey's was in effect requiring Trouard to waive his claims against Dickey's for making earnings claims in violation of COMAR 02.02.08.16.D(3).  This conduct violated COMAR 02.02.08.16.L(3), and by operation of law Section 14-229(a)(3) of the Act.

114.    Defendants Denton and Roland are jointly and severally liable with Dickey's pursuant to Sections 14-227(d)(iii) and (v) of the Act.

115.    As a direct and proximate result of Defendants' wrongful conduct, Trouard was induced to purchase a Dickey's Barbecue Pit franchise and suffered financial loss in excess of $1,000,000.

116.    Pursuant to Sections 14-227(a) and (b) of the Act Defendants are civilly liable to Trouard for the damages sustained as a result of the grant of the franchise.

117.    Pursuant to Section 14-227(c) of the Act the Court may order Dickey's to rescind the agreement and make restitution to Trouard.

## COUNT VII – DECLARATORY JUDGMENT
### Declaratory Relief Pursuant to 28 U.S.C. § 2201

118.    Trouard repeats and incorporates by reference the allegations in Paragraphs 1-67, above, as if fully set forth.

119.    28 U.S.C. § 2201 confers upon the Court the power to determine within its District the rights of the parties to a contract where an actual controversy exists.

120.    An actual controversy exists between Trouard and Dickey's regarding the interpretation of Article 27 of the Franchise Agreement.

121.    The controversy relates to  whether the arbitration clause in the Franchise Agreement is enforceable in light of the provisions of Article 29 of the Franchise Agreement, and the operative effect of COMAR 02.02.08.16(L)(3) and Section 14-229(a)(3) of the Act.

122.    Specifically, Trouard contends, and Defendant disputes, that:

    a.    pursuant to the provisions of Article 29 of the Franchise Agreement,
    COMAR 02.02.08.16(L)(3) and, by operation of law, Section 14-229(a)(3) of the Act,
    renders the arbitration agreement unenforceable because the language of Article 27.2 is

materially inconsistent with the MFRDL and cannot be modified so as to make the provision enforceable; and

      **b.**     the Pending Arbitration is void and without any effect as to Trouard's rights and obligations under the Franchise Agreement.

### COUNT VIII – INJUNCTIVE RELIEF

123.     Trouard repeats and incorporates by reference the allegations in Paragraphs 1-67, above, as if fully set forth.

124.     Trouard will suffer immediate and irreparable harm if he is compelled to arbitrate the pending dispute when the Franchise Agreement does not contain an enforceable arbitration agreement.

125.     In the alternative, Trouard will suffer immediate and irreparable harm if he is compelled to arbitrate Dickey's claims prior to a full and fair determination on the merits of his claims under the Act, which will determine the validity of the Franchise Agreement and, of necessity, determine whether Dickey's has any enforceable rights that may be asserted in the Pending Arbitration.

126.     Trouard has a likelihood of success on the merits in that the arbitration agreement in the Franchise Agreement is subject to other contractual provisions that render it void and inoperable to the extent it conflicts with the MFRDL.

127.     Trouard has no adequate remedy at law; the balance of the equities favors Trouard; and public policy supports the issuance of interim injunctive relief.

128.     Trouard is entitled to preliminary and permanent injunctive relief enjoining Dickey's from proceeding with the Pending Arbitration.

WHEREFORE, Trouard prays that the Court enter judgment in his favor as follows:

      A.     As to Counts I through V, entering judgment against the Defendants, jointly and

severally, in the amount of One Million Dollars ($1,000,000.00), or in accordance with proof at trial, as to Counts I and II;

C.      As to Counts I through IV, ordering that Dickey's rescind the Maryland Franchise Agreement and pay an amount in restitution sufficient to restore Trouard to his original position, including reasonable attorneys' fees expended in bringing this action, in accordance with Section 14-227(c) of the Maryland Franchise Registration and Disclosure Law;

D.      As to Count VI, declaring that the arbitration clause in the Franchise Agreement is void and unenforceable because it is inconsistent with the provisions of the Maryland Franchise Registration and Disclosure Law and regulations issued thereunder;

E.      As to Count VII, preliminarily and permanently enjoining the Defendants, and all persons in active concert with them, from maintaining or taking any action to prosecute Case Number 71 114 Y 00028 14, and styled as *Dickey's Barbecue Restaurants, Inc. AND Justin Trouard,* now pending before the American Arbitration Association;

F.      Awarding Trouard both pre- and post-judgment interest on all damages awarded, as well as his costs of litigation; and

G.      Granting Trouard such other and further relief as justice and equity may require.

Respectfully submitted,


_____/s/ Andrew K. Wible_____
Andrew K. Wible, Md. Fed. Bar No. 18699
awible@cohenmohr.com
Russell J. Gaspar, Md. Fed. Bar No. 14908
rgaspar@cohenmohr.com
C. Patteson Cardwell, IV
pcardwell@cohenmohr.com

COHEN MOHR, LLP
1055 Thomas Jefferson Street, N.W., Suite 504

Washington, D.C.  20007
Tel:  (202) 342-2550
Fax:  (202) 342-6147

Attorneys for Plaintiffs


## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b) Plaintiffs demand a trial by jury on all issues so triable.

_____/s/ Andrew K. Wible_____